HON. DAVID NORIEGA RODRÍGUEZ, demandante y apelado, *v.* HON. RAFAEL HERNÁNDEZ COLÓN y OTROS, demandados y apelantes; GRACIANY MIRANDA MARCHAND, demandante y apelado, *v.* CARLOS LÓPEZ FELICIANO y OTROS, demandados y apelantes.

*Números:* CE-87-556      *Resueltos:* 21 de noviembre de 1988
CE-87-665

---

654

*Rafael Ortiz Carrión, Procurador General, Norma Cotti Cruz, Subprocuradora General, y Lorenzo Vilanova Alfonso, Procurador General Auxiliar,* abogados de los apelantes; *José Juan Nazario De la Rosa, Juan Santiago Nieves, Armando De León Vargas,* de *Nazario, Santiago & De León,* y *Luis Rivera Lacourt,* abogados de David Noriega Rodríguez, apelado; *Rafael Rivera Rosa,* de *Rivera Rosa & Díaz Maisonet,* abogado de Graciany Miranda Marchand, apelado.

El Juez Asociado Señor Ortiz emitió la opinión del Tribunal.

No hay nada más preciado para un "hombre de bien" que su dignidad y reputación en la comunidad. Si por sus actuaciones ilegales o inmorales las hace quedar en entredicho, responderá a su conciencia, a sus seres más íntimos y a todos sus congéneres. Estará, en dicho caso, sujeto a las sanciones penales y civiles que correspondan. Pero si su dignidad y reputación son afectadas ilegalmente por el propio Estado por el mero hecho de haber ejercitado sus derechos fundamentales, según éstos están garantizados en la Constitución, su yo interno debe poseer un cauce adecuado para la reparación por las faltas a su dignidad y a su honor. En el sistema democrático en que convivimos le corresponde a los tribunales atender tales reclamos y diseñar remedios que propendan a aminorar el daño irreparable que el ciudadano ha sufrido por razón de los desmanes del Estado. De eso se trata este caso. Nos corresponde resolver si el mecanismo

procesal implantado por el tribunal es el adecuado para vindicar los derechos de los miles de ciudadanos afectados por la práctica ilegal o inconstitucional llevada a cabo por el Estado durante las últimas décadas.

El Tribunal Superior, Sala de San Juan, declaró en varias ocasiones que la práctica de levantar expedientes, carpetas, listas, ficheros, etc. de personas, agrupaciones y organizaciones, única y exclusivamente por motivo de las creencias políticas e ideológicas de éstas, sin que se tenga prueba real que vincule a esas personas con la comisión o intento de comisión de un delito, es ilegal e inconstitucional por infringir los derechos de libertad de palabra, de asociación y de intimidad, y por constituir una afrenta a la dignidad del ser humano. El tribunal resolvió que dicha práctica es totalmente ajena a nuestro sistema democrático de gobierno.

Esta odiosa y desafortunada práctica que tanta adversidad e infortunio ha levantado en nuestro país no es única ni particular en nuestra sociedad. Uno de los más atinados y persuasivos análisis de esta práctica es el siguiente:

> Early in this century, the United States Supreme Court was called upon to decide a case that foreshadowed dire events: domestic surveillance of citizens, political espionage of dissidents, unauthorized wiretapping and electronic eavesdropping, information banks and the panoply of offenses summed up in the word Watergate.
>
> In testimony before the Senate Judiciary Committee, Professor Arthur R. Miller of the Michigan and Harvard law schools once spoke darkly of a time of approaching "dossier dictatorship".
>
> The two concepts —privacy and dossiers— inevitably collide.
>
> The purpose of this book is to demonstrate by example that, in most cases, government dossiers are constitutionally unsound, fruitless and dangerous—dangerous not only to the individual who is harmed by having an unnecessary government record that follows him, and possibly his family, forever, but

also to the nation's values and traditions of personal independence.

Dossiers are a heritage of hysteria about radicalism and of the cold war. In the last decade much of the FBI's Hooverian paranoia has evaporated, thanks to congressional oversight and increased public awareness of the dangers of secret subgovernments. Nevertheless, in more recent times, lawlessness has been revealed on other, more radical levels that recall Sinclair Lewis's novel, It Can't Happen Here. The Iran-Contra hearings showed an interlocking network of official spies, mercenaries, former generals, opportunists and cold war profiteers operating within government precincts but outside the constitution and institutions of government.

. . . In recent years, and especially during the reign of Richard M. Nixon, revelations have emerged of an increasing intrusion by the federal government into private lives and careers. If a person did not have a file with the Federal Bureau of Investigation, chances were good that he would be included in the computerized information bank of the Central Intelligence Agency, one of the congressional security committees, the Passport Office, the Department of Justice's Division of Internal Security, the intelligence branches of the armed services, or any of a dozen other federal, state and city police agencies. The Massachusetts State Police Division of Subversive Activities, for example, is reported to have done thousands of security name-checks, some in response to private inquiries, on "peace groups, civil rightists and other such groups." Today, in addition to its ordinary benefits, the computer has opened up a new and improved era of electronic snooping and recordkeeping. H.M. Mitgang, *Dangerous Dossiers—Exposing the Secret War Against America's Greatest Authors*, Nueva York, P.I. Fine, Inc., 1988, págs. 13–14.

Concluye este eminente autor su primer capítulo con el siguiente comentario sobre el derecho a la intimidad:

At a modern reenactment of the First Continental Congress that was held in Philadelphia, the proposal was made that another constitutional amendment was needed "to guarantee forever that the people have the right to personal privacy and freedom from undue government interference." It's

not a bad idea, but one that is hardly necessary. The "right to be let alone," for authors and everyone else with or without allegedly damning dossiers, is already there: in the spirit of the Constitution and in the minds of fearless men. Mitgang, *op. cit.*, pág. 26.

En el caso ante nos, el Estado, desde el inicio de los litigios, ha admitido que la práctica antes señalada es ilegal y ha aceptado y prometido que habrá de descontinuarla. Esta honesta y loable actitud simplificó en algo la labor del tribunal de instancia y, claro está, nuestra función revisora. No por ello ha perdido vitalidad e importancia la controversia. El recurso del Estado plantea serias, noveles y significativas interrogantes sobre los remedios establecidos e implantados por el tribunal de instancia.

Procedemos a analizar, discutir, pormenorizar y fundamentar las razones que nos mueven a confirmar las decisiones que son objeto de este recurso.

I

El representante David Noriega Rodríguez presentó, el 8 de julio de 1988, una demanda titulada "Acción civil, *injunction* preliminar y permanente" contra el Gobernador, el Superintendente de la Policía y el Estado Libre Asociado de Puerto Rico. En lo pertinente, alegó que, a petición suya, la Cámara de Representantes había aprobado la Petición de Información Núm. 167, en la que se solicitaba que el Superintendente de la Policía proporcionara la información siguiente:

a) La lista de ciudadanos y entidades que han sido calificad[a]s como "subversivos" y a quienes se les haya abierto expediente o carpeta en la División de Inteligencia de la Policía.

b) Los criterios o reglamentación vigente que rige la inclusión de ciudadanos o entidades en dicha calificación de "subversivo". Caso Núm. CE-87-556, Apéndice, pág. 119.

Sostuvo que el demandado no había provisto la información, ya que había referido al Secretario de Justicia el asunto para que éste rindiera una opinión legal. Pidió que el tribunal ordenara a los demandados que:

a) El licenciado López Feliciano, Superintendente de la Policía de Puerto Rico, ponga bajo su directo y exclusivo control todos los documentos, carpetas, manuales, memorandos, listas y directrices, declaraciones y material fílmico, de audio, fotográfico o computa[dorizado], relacionado con actuaciones de miembros de la Policía de Puerto Rico que hayan estado encaminadas directa o indirectamente a clasificar a cualquier ciudadano o entidad en las categorías de independentista, separatista o subversivo.

b) El licenciado López Feliciano, Superintendente de la Policía de Puerto Rico, coloque la documentación descrita en el apartado anterior en una bóveda o archivo donde puedan preservarse intactas.

c) El licenciado López Feliciano, Superintendente de la Policía de Puerto Rico, efectúe un inventario completo y detallado y exhaustivo de la documentación aludida y someta copia sellada del mismo . . . al Honorable Tribunal. Tal inventario deberá contener los nombres de las personas o entidades con expedientes o enlistadas, una descripción del número, tipo de documentos y su localización en archivos.

d) Los codemandados describan en detalle las medidas tomadas hasta el momento para resguardar y salvaguardar íntegramente los documentos aludidos e indiquen los documentos o expedientes que hayan sido movidos o destruidos por cualquier razón, con indicación de las fechas en que esto haya ocurrido.

e) Los codemandados sometan una lista de las personas [o] agencias locales o federales que hayan tenido acceso para inspección o duplicación de cualquiera de los documentos objeto del alcance y cubierta de esta orden indicando nombres de la agencia y de la persona encargada, la fecha y la descripción del documento al cual se le brindó acceso.

f) Advierta a los codemandados que nada de lo aquí ordenado interferirá con el cumplimiento que en su día deba hacerse como cuestión de derecho con la Petición de Informa-

ción número 167 o de cualquier recurso que se presente ante el foro judicial competente relacionado con este asunto. Caso Núm. CE-87-556, Apéndice, págs. 121–122.

El Tribunal Superior, Sala de San Juan (Hon. Arnaldo López Rodríguez, Juez), señaló una conferencia con antelación a la vista de *injunction* preliminar y ordenó que los demandados fueran citados para dicha vista. A solicitud de los demandantes, presentada dos (2) días después de la anterior orden, el tribunal dictó orden de entredicho provisional sobre los extremos siguientes:

1. Se le ordena al Honorable Gobernador de Puerto Rico, Honorable Secretario de Justicia, Señor Superintendente de la Policía, Agentes y Oficiales de la Policía de Puerto Rico que se abstengan de destruir, quemar, mutilar y alterar cualquier lista de personas que han sido calificados subversivos y a quienes se les haya abierto expediente o carpeta en la División de Inteligencia de la Policía de Puerto Rico.

En el interín, el 15 de julio de 1987 el abogado Graciany Miranda Marchand demandó al Superintendente de la Policía, al Director de la División de Inteligencia de la Policía y al Secretario de Justicia al sostener que su nombre aparecía en un listado preparado y conservado por la Policía de supuestos elementos subversivos y que la Policía mantenía un expediente sobre su persona. Solicitó que:

1- Ordene a la parte demandada que entregue sin dilación ni excusa alguna, todo documento en su poder relativo a la persona del peticionario entendiéndose por documento todo escrito, original o no, manuscrito, mecanografiado, fotocopiado o conservado mediante cualquier sistema mecánico, incluyendo, pero sin limitarse a, microfichas, grabaciones de sonido, cintas videomagnetofónicas, computadoras y procesadoras de palabras, fotografías, y cualquier otro objeto análogo conservado bajo cualquier sistema de colección de datos.

2- Declare ilegal, [*ultra vires*] e inconstitucional la práctica de mantener listados y expedientes sobre personas que no son el resultado de una investigación criminal [*bona fide*].

3- Ordene a la parte demandada que se abstenga permanentemente en lo futuro de la práctica expresada en esta petición. Caso Núm. CE-87-665, Parte I, Apéndice 12, pág. 205.

Al igual que en el otro caso, el tribunal señaló una conferencia con antelación a la vista a ser celebrada el 20 de julio de 1987, fecha en la cual el tribunal consolidó ambos casos. En esa vista, los demandados informaron que no había controversia sobre el hecho de que en la División de Inteligencia de la Policía existían expedientes de personas levantados por razón de su ideología política.

En cuanto a la situación del licenciado Miranda Marchand, los demandados admitieron que en la División de Inteligencia de la Policía su nombre aparece en un fichero, por lo que se presume que existe un expediente. Se comprometieron a que tan pronto lo examinaran, de no existir ninguna información confidencial, le sería entregado. De existir alguna información confidencial, el expediente sería sometido al tribunal para que éste resolviera el reclamo de confidencialidad.

El 20 de julio de 1987 el tribunal dictó sentencia escrita en la que incorporó los acuerdos en cuanto al demandante Miranda Marchand.

El 22 de julio los demandados presentaron un escrito titulado "Moción informativa y otros extremos", en el que informaron que el Gobernador de Puerto Rico, Hon. Rafael Hernández Colón, había aprobado, el 21 de julio de 1987, una Orden Ejecutiva denominada "Orden Ejecutiva del Gobernador del Estado Libre Asociado de Puerto Rico para establecer la creación del Consejo para la Protección del Derecho a la Intimidad de los Ciudadanos y para la Seguridad de las Personas y del Estado Libre Asociado de Puerto Rico, y proveer las facilidades y los recursos necesarios para tales fines." Caso Núm. CE-87-665, Parte I, Apéndice 14, pág. 230.

En apoyo de su posición, los demandados argumentaron y solicitaron que:

6. El Consejo, el cual deberá observar unas guías específicas de funcionamiento, a los fines de proteger la seguridad interna y los derechos de las personas envueltas, será uno de carácter continuo y permanente, el cual estará integrado por el Secretario de Justicia, quien será su Presidente, el Superintendente de la Policía de Puerto Rico y los tres últimos e[x j]ueces que estén disponibles del Tribunal Supremo de Puerto Rico.

7. El Consejo tendrá, entre otras, las siguientes responsabilidades:

". . . examinará, evaluará y revisará los expedientes bajo la jurisdicción y custodia de la Policía de Puerto Rico y del Negociado de Investigaciones Especiales del Departamento de Hacienda. Todo expediente existente que a juicio del Consejo no cumpla con las guías anteriormente expuestas será invalidado y separado a los fines del siguiente procedimiento:

El Consejo enviará una notificación confidencial a cada individuo u organización que sea el sujeto del expediente invalidado, en la que se informe a ese individuo u organización de la existencia de dicho expediente, y se le ofrezca la oportunidad de examinar, personal y confidencialmente, el contenido de dicho expediente dentro de un plazo fijo y razonable, excepto aquella información relacionada con la intimidad o confidencialidad de cualquier otro individuo u organización.

Al vencimiento del plazo establecido por el Consejo para que los individuos u organizaciones que sean los sujetos de los expedientes invalidados puedan efectuar el examen privado de sus respectivos expedientes, y con el propósito de proteger el derecho de intimidad de estos individuos y de las organizaciones concernidas, hasta donde sea legalmente procedente el Consejo presentará al Tribunal Superior de Puerto Rico una petición confidencial requiriendo que dicho foro judicial evalúe el procedimiento adoptado por el Consejo para la disposición permanente del expediente invalidado. Luego de la debida disposición de un expediente invalidado, el Consejo expedirá una certificación de que no ha retenido copia alguna del referido expediente y enviará inmediatamente copia de tal certificación a los individuos u organizaciones que sean los sujetos de tales expedientes."

8. En vista de las garantías constitucionales que la creación de dicho consejo provee a todos aquellos ciudadanos que,

como el Lcdo. Graciany Miranda Marchand, entiendan que se les ha vulnerado sus derechos civiles, debe de concederse la oportunidad a dicho Consejo para que en el ejercicio de jurisdicción primaria adopte las medidas pertinentes para facilitarle el acceso a los documentos, tomando en consideración en cada caso los intereses públicos y privados envueltos. *López Vives* v. *Policía de Puerto Rico*, 87 J.T.S. 6, a la página 4683.

9. Las garantías que se le ofrecieron al Lcdo. Graciany Miranda Marchand en nuestra estipulación de fecha 20 de julio de 1987 ante este Honorable Tribunal están plenamente salvaguardadas en el procedimiento que dispone la referida Orden Ejecutiva. Así también, consignamos que se recomendará al Consejo que dé prioridad a esta solicitud en consideración a la petición del Lcdo. Miranda Marchand ante este Honorable Tribunal.

Respetuosamente entendemos que, siendo las garantías que este Consejo ofrece aún mayores que aquellas bajo la estipulación, como deferencia al Poder Ejecutivo, debe concederse la oportunidad a dicho Cuerpo, integrado mayoritariamente por los tres últimos e[x j]ueces del Tribunal Supremo de Puerto Rico, de evaluar el contenido de dicho expediente para determinar si el Estado tiene un fin legítimo para la conservación del mismo.

POR TODO LO CUAL, muy respetuosamente solicitamos de este Honorable Tribunal, que declare No ha Lugar la solicitud de la representación legal del Hon. David Noriega relativa a que se recopile un listado con el nombre de las personas que tienen expedientes en la Policía de Puerto Rico y que se remitan los mismos en sobre lacrado y sellado a este Honorable Tribunal. En lo que respecta a la evaluación del expediente del licenciado Graciany Miranda Marchand por el Superintendente de la Policía, señalamos, que a[u]n cuando se comenzó a evaluar dicho expediente, debe ser el Consejo quien realice esta gestión. Por lo que, con sumo respeto, solicitamos se paralicen los procedimientos por un término razonable, a los fines, de que una vez constituido el Consejo para la Protección del Derecho a la Intimidad de los Ciudadanos y para la Seguridad de las Personas y del Estado Libre Asociado de Puerto Rico, se transfiera al Consejo éste y todos los demás expedientes bajo el control de la Oficina de Inteligencia de la Poli-

cía de Puerto Rico a los efectos de que dicho Cuerpo realice las funciones afines a los propósitos de su creación. Caso Núm. CE-87-665, Parte I, Apéndice 14, págs. 230–232.

El tribunal celebró una vista el 28 de julio para considerar dicha moción. El 31 de julio el tribunal dictó la sentencia siguiente:

1) Se declara que la práctica de levantar expedientes, carpetas, listas, ficheros, etc., de personas, agrupaciones y organizaciones única y exclusivamente por motivo de las creencias políticas e ideol[ógic]as de éstos sin que se tenga evidencia real que vincule a esas personas con la comisión o intento de comisión de un delito, es ilegal e inconstitucional por infringir los derechos de libertad de palabra, de asociación y de privacidad y por constituir ello una afrenta a la dignidad del ser humano.

También se declara que esa práctica es totalmente ajena a nuestro sistema democrático de gobierno.

2) Se libra auto de [*injunction*] permanente contra el Gobernador de Puerto Rico, el Superintendente de la Policía de Puerto Rico, los sucesores de éstos, y contra todos los miembros y empleados de la Policía de Puerto Rico para que cesen y descontin[ú]en de inmediato y permanentemente en la práctica descrita en el párra[f]o anterior.

3) Se le ordena a la parte demandada entregar al demandante, Lcdo. Gracian[y] Miranda Marchand, y a todas aquellas personas que se encuentren en la misma situación que éste, todo documento en poder de la Policía de Puerto Rico que obr[e] en cualquier carpeta, archivo o fichero que se haya abierto única y exclusivamente por motivo de las ideas políticas de dicha[s] persona[s], entendiéndose por documento, todo escrito original o no, manuscrito, mecanografiado, fotocopiado o conservado mediante cualquier sistema mecánico, incluyendo sin limitarse a microfichas, grabaciones de cualquier índole, bien de sonido, cintas videomagnetofónicas, computadoras, procesadoras de palabras, fotografías, y cualquier objeto análogo conservado en la Policía de Puerto Rico bajo cualquier sistema de colección de datos, disponiéndose que en el caso del demandante, Lcdo. Gracian[y] Miranda Marchand, dichos documentos deberán ser entregados a éste personal-

mente dentro de los próximos quince (15) días a partir de la fecha de notificación de esta Sentencia.

En cuanto a la fecha y medio de entrega de los documentos a todas las otras personas que se encuentran en la misma situación que el demandante, se fijará la fecha y se establecerá el mecanismo de entrega mediante resolución a emitirse posteriormente, previa consulta del Tribunal con las partes en este pleito.

4) Se le proh[í]be terminantemente a la parte demandada retener copia reproducida por cualquier método de los documentos anteriormente indicados.

5) En la eventualidad del Estado levantar cualquier reclamo de confidencialidad con respecto a alguna información que obre en algunos de los expedientes, se procederá a conservar el documento cuya confidencialidad se reclame en un sobre lacrado y el mismo se remitirá de inmediato a este Tribunal para la resolución de tal reclamo.

6) El Tribunal se reserva el derecho de designar un Panel de Comisionados para que eval[ú]en los reclamos de confidencialidad y recomienden al Tribunal la resolución adecuada sobre tal reclamo.

7) En adición a la entrega de los documentos antes descrito[s] a las personas concernidas, deberá la parte demandada suplirle a ést[a]s la siguiente información, si la misma no surgiere de los documentos:

(i) Fecha en que se abrió el expediente.

(ii) Criterios que se usaron para abrir el expediente.

(iii) Uso, si alguno, que la Policía le dio al expediente de las personas, esto incluye sin limitarse entre otros: (a) Si se le suministró información a alguna persona, organización o entidad de que el sujeto a quien se le abrió el expediente era considerado por la Policía de Puerto Rico como "subversivo"; (b) persona o entidad a quien se le dio esa información y (c) la fecha en que se di[o] la misma.

8) Deberá la parte demandada entregar a este Tribunal en sobre sellado, dentro de los próximos quince (15) días a partir de la fecha de notificación de esta Sentencia, la siguiente información:

(i) Una relación con todos los nombres de personas o entidades con expedientes en la Policía de Puerto Rico, cuyos

expedientes han sido abiertos únicamente por motivos de criterios políticos.

(ii) El Número de folios que consta el expediente de cada una de esas personas o entidades.

(iii) El lugar preciso donde se encuentra ubicado cada expediente.

(iv) La cantidad total de expedientes.

(v) El número de expedientes por archivo.

(vi) La cantidad total de archivos.

9) Por el momento y hasta tanto se disponga lo contrario, se le ordena al Superintendente [de] la Policía de Puerto Rico lo siguiente:

(i) Poner bajo su directo y exclusivo control todos los referidos documentos, carpetas, manuales, memorandos, listas y directrices, declaraciones y material fílmico, de audio, fotográfico o computa[dorizado], relacionado con actuaciones de miembros de la Policía de Puerto Rico que hayan estado encaminadas directa o indirectamente a clasificar a cualquier ciudadano o entidad en l[a] categoría de "subversivo".

(ii) Se le ordena al Lcdo. Carlos J. López Feliciano, Superintendente de là Policía de Puerto Rico, colocar la documentación descrita en el apartado anterior en una bóveda o archivo donde puedan preservarse intactos todos los referidos documentos.

(iii) Se le ordena a[l] Lcdo. Carlos J. López Feliciano, Superintendente de la Policía de Puerto Rico, mantener un registro de la forma más detallada posible para controlar el acceso de personas al referido lugar y la entrada de documentos.

(iv) En ningún momento ninguno de los referidos documentos podrán ser alterados, modificados o removidos del lugar en que se encuentran, salvo únicamente para dar cumplimiento a aquella parte de esta Sentencia que se refiere a la entrega de documentos a las personas concernidas.

(10) Se deroga por la presente todas aquellas disposiciones de la Orden Ejecutiva promulgada el día 21 de julio de 1987, y publicada en el Boletín Administrativo Núm. 4970-A, para establecer el Consejo, que estén en conflicto con la presente Sentencia, en particular se deroga aquella parte del Inciso b del Artículo 3 de la referida orden que reglamenta la disposición de los expedientes bajo la jurisdicción y custodia de la

Policía de Puerto Rico.(¹) (Escolios omitidos.) Caso Núm. CE-87-665, Parte I, Apéndice 5, págs. 98–103.

Mediante Resolución y Orden de 17 de agosto de 1987, el tribunal abundó sobre los fundamentos en apoyo de su dictamen y el procedimiento a seguir.

El 20 de agosto se declaró sin lugar la moción de reconsideración. Se aclaró que la próxima vista sería para atender y considerar las recomendaciones y sugerencias que se les requirió a las partes en torno a los aspectos de naturaleza procesal relacionados con el remedio concedido en la sentencia; es decir, con el procedimiento para la entrega de los cartapacios a las personas concernidas.

El 26 de agosto los demandados presentaron ante este Tribunal un escrito de apelación o petición de revisión (Caso

---

(¹) Se refiere al procedimiento siguiente:

"b. El Consejo examinará, evaluará y revisará los expedientes bajo la jurisdicción y custodia de la Policía de Puerto Rico y del Negociado de Investigaciones Especiales del Departamento de Justicia. Todo expediente existente que a juicio del Consejo no cumpla con las guías anteriormente expuestas será invalidado y separado a los fines del siguiente procedimiento:

"1. El consejo enviará una notificación confidencial a cada individuo u organización que sea el sujeto del expediente invalidado, en la que se informe a ese individuo u organización de la existencia de dicho expediente, y se le ofrezca la oportunidad de examinar, personal y confidencialmente, el contenido de dicho expediente dentro de un plazo fijo y razonable, excepto aquella información relacionada con la intimidad o confidencialidad de cualquier otro individuo u organización.

"2. Al vencimiento del plazo establecido por el Consejo para que los individuos u organizaciones que sean los sujetos de los expedientes invalidados puedan efectuar el examen privado de sus respectivos expedientes, y con el propósito de proteger el derecho de intimidad de estos individuos y de las organizaciones concernidas, hasta donde sea legalmente procedente, el Consejo presentará al Tribunal Superior de Puerto Rico una petición confidencial requiriendo que dicho foro judicial evalúe el procedimiento adoptado por el Consejo para la disposición permanente del expediente invalidado. Luego de la debida disposición de un expediente invalidado, el Consejo expedirá una certificación de que no ha retenido copia alguna del referido expediente y enviará inmediatamente copia de tal certificación a los individuos u organizaciones que sean los sujetos de tales expedientes." Caso Núm. CE-87-665, Parte I, Apéndice 14, págs. 239–240.

Núm. CE-87-556). El 27 de agosto emitimos la resolución siguiente:

Examinados los méritos de la petición formulada por el Estado Libre Asociado de Puerto Rico y demás co-demandados, en consideración a que la Sentencia del Tribunal Superior, Sala de San Juan (Hon. Arnaldo López Rodríguez) dictada el 31 de julio, según reiterada y aclarada los días 17, 19 y 21 de agosto de 1987, es una inconclusa —por estar pendiente de trámite e implantación final el remedio provisto en dicha Sentencia— el Tribunal provee no ha lugar al recurso radicado en esta etapa de los procedimientos.

Este dictamen no prejuzga los planteamientos del Estado y cualesquiera otros que los demandantes Noriega Rodríguez y Miranda Marchand en su oportunidad pudieran reproducir y esgrimir ante este foro apelativo una vez culminados los trámites referentes a la formulación del remedio y se conozca en toda su dimensión sus efectos sobre las partes y terceras personas. Caso Núm. CE-87-665, Parte I, Apéndice 1, págs. 1–2.

El 14 de septiembre el tribunal dictó la sentencia objeto de este recurso. En la misma se ratificó el rechazo de la contención principal del Estado de que todo el asunto de la disposición definitiva de los expedientes levantados ilegalmente se debe dejar exclusivamente en sus manos para que sea el Consejo quien se encargue de dicho asunto. A esos efectos resolvió que:

El Tribunal ha rechazado en todo momento esa posición tajante del Estado por considerar que la misma no es moral ni legalmente aceptable. Atendida la confesión del Estado de haber estado incurriendo por varias décadas en la práctica declarada inconstitucional en esta Sentencia, no creemos que sea lo más prudente y lo más aconsejable dejar ahora exclusivamente en sus manos la impl[a]ntación del remedio de la disposición de las tarjetas y cartapacios abiertos ilegalmente a miles de ciudadanos.

Esta súbita conversión del Estado de perseguidor de estos grupos minoritarios por la sola razón de sus ideas políticas —de independencia— a ahora protector de estas clases, no le

d[a] derecho a investirse con la pretendida autoridad desprovista la misma de la tutela del Poder Judicial, máxime en ausencia de una legislación penal adecuada que sirva de disuasivo a la referida práctica.

Ante esa situación de flagrante masiva violación a los derechos constitucionales del individuo por parte del Estado, este Tribunal muy bien pudo decretar el traslado de todas las tarjetas y expedientes ante este Tribunal y proceder a designar a un Panel de Comisionados para que se encargara de impl[a]ntar el remedio de la Sentencia Parcial. Recuérdese que la reivindicación de los derechos constitucionales corresponden a y pueden reclamarse en primera instancia, en los tribunales de justicia. *Otero Martínez* vs. *Gobernador*, 106 D.P.R. 552–556 (1977); *Santiago* vs. *Desiderio Cartagena*, 82 J.T.S. 24.

Ante estas dos posiciones o sea, la del Tribunal encargarse exclusivamente de impl[a]ntar el remedio de la Sentencia o dejar dicho asunto exclusivamente en manos del Estado, como siempre ha sido su pretensión, adoptamos una posición intermedia, a saber: dejar parcialmente el asunto en manos del Estado con unas guías del Tribunal y una supervisión limitada por parte del Tribunal. (Énfasis suprimido.) Caso Núm. CE-87-665, Parte I, Apéndice 2, págs. 8–9.

Con el propósito de hacer viable la entrega de los expedientes abiertos ilegalmente a las personas concernidas, calculados por el propio Estado en 74,000, éste estableció unas reglas detalladas y específicas. Para una mayor comprensión y facilidad de análisis de las reglas, las reproducimos íntegramente:

*Regla 1.- Disposición del tarjetero que contiene el nombre de aproximadamente 74,000 nombres de personas y entidades*:

1.1) Por cuanto fue aceptado por el Estado que las referidas tarjetas, en adición al nombre y los datos generales de las personas, también contiene datos de investigaciones, dichas tarjetas serán consideradas para todos los propósitos como un expediente y la disposición permanente de las mismas será idéntica a la de los expedientes y/o cartapacios, procedimiento que se informa más adelante.

1.2) Si la persona o entidad sujeto de la(s) tarjeta(s) posee también un expediente en tal situación la(s) tarjeta(s) pasarán

a formar parte del expediente en cuyo caso se procederá a trasladar la misma del tarjetero al expediente.

1.3) En la eventualidad de que la(s) tarjeta(s), corra sola o sea, de que no tenga un expediente, en tal situación la(s) tarjeta(s) constituirá el expediente.

*Regla 2.- Examen de los expedientes y tarjetas previo a su entrega a las personas sujeto del expediente o la(s) tarjeta(s):*

2.1) La persona encargada de realizar el referido examen será aquella que designe el Primer Ejecutivo.

*Regla 3.- Medio de notificación a las personas con expedientes y tarjetas para informarle de la existencia de éste y de su disponiblilidad para su entrega:*

3.1) Se le enviará a la persona concernida una notificación confidencial de la forma menos conspicua posible por correo certificado con acuse de recibo a la última dirección conocida, con la restricción de que la correspondencia sea entregada únicamente al destinatario, en la que se le informará a la persona de la existencia de dicho expediente y de su disponibilidad para ser entregado a dicho *sujeto personalmente*, el día, lugar y hora que fije la parte demandada.

3.2) De no recibirse la referida carta, se procederá a la entrega de la misma personalmente.

En tal situación la carta será diligenciada de acuerdo a como dispone la Regla 4.4 de las de Procedimiento Civil.

Dicha carta podrá ser diligenciada por cualquier persona que no sea menor de 18 años de edad y que sepa leer y escribir.

3.3) La persona que diligencie la carta presentará la constancia de haberlo hecho en un documento original, sin copia, el que será archivado dentro del expediente de la persona y de no existir expediente, se unirá el mismo a la(s) tarjeta(s) de la persona concernida.

3.4) De realizarse un diligenciamiento negativo, se deberá indicar en detalle las gestiones realizadas para entregar la carta. En tal situación, tanto la carta como el diligenciamiento se incorporarán a la(s) tarjeta(s) o al expediente.

3.5) Aquellas personas o familiares de personas fallecidas que por tener algún motivo para creer tener una(s) tarjeta(s) o expediente en la División de Inteligencia que acudan a la Policía de Puerto Rico a indagar sobre tal asunto, se les infor-

mará de inmediato a éstos si existe o no en la División una(s) tarjeta(s) o expediente sobre su persona.

De existir alguna tarjeta(s) o expediente en la División de Inteligencia de dicha persona o familiar de ésta fallecido, se le informará la fecha, hora y lugar en que podrá acudir a recoger el mismo. En tal situación se dejará constancia en el expediente o en la[(]s) tarjeta(s) de la visita de dicha persona y de la cita que se le di[o] para recoger el expediente o tarjeta(s). En estos casos se prescindirá del requisito de notificación que se establece en estas Reglas.

*Regla 4.- Disposición permanente de tarjetas y expedientes*:

I. Personas o entidades que comparecieron a recoger sus tarjeta(s) o expediente:

4.I.1) Aquellas personas que respondieron a la notificación y las que acudieron directamente y les fue dada una cita le[s] será entregad[a] su[s] tarjeta(s) o expediente o ambas cosas, según sea el caso.

4.I.2) Previo a la entrega del expediente o tarjeta(s) a la persona concernida el Estado se asegurará de haber enumerado y marcado con un sello de goma y haber rubricado todos y cada uno de los folios que contiene el expediente. Esta medida cautelar evitará la posibilidad de que una vez entregada la tarjeta(s) o cartapacio sus folios sean alterados (en particular introduciendo otros folios).

II. Disposición de tarjetas y expedientes de personas debidamente notificadas y que no respondieron a la notificación:

4.II.1) Estos expedientes serán remitidos al Tribunal para su destrucción posterior.

III. Disposición de tarjetas y expedientes de personas o entidades cuyo paradero se desconoce.

4.III.1) Estos expedientes serán remitidos al Tribunal para su destrucción posterior.

IV. Disposición de tarjetas y expedientes pertenecientes a personas fallecidas.

4.IV.1) Las referidas tarjetas y/o expedientes serán entregados a los herederos forzosos de la persona fallecida.

4.IV.2) Las personas que reclamen el expediente deberán acreditar con prueba fehaciente su derecho al referido expediente. La referida prueba consistirá bien en una resolución de declaratoria de heredero o copia certificada de un testamento, lo que corresponda.

4.IV.3) De surgir conflicto entre herederos sobre quién tiene mejor derecho por la posesión de la(s) tarjeta(s) o expediente del occiso, se procederá en tal caso a la consignación de la(s) tarjeta(s) o expediente en el Tribunal.

4.IV.4) En ausencia de herederos forzosos la(s) tarjeta(s) o el expediente perteneciente a persona fallecida serán remitidos al Tribunal para su destrucción posterior.

*Regla 5.- Información que contendrá el recibo que debe suscribir la persona al momento de la entrega de su expediente; quiénes podrán retener copia del referido recibo y por cuanto tiempo se debe conservar dicho documento antes de su destrucción:*

5.1) El recibo que firme la persona sujeto del expediente deberá rezar de la siguiente forma:

"Yo, *fulano de tal*, recibí de las manos de _____hoy_____de_____de 19_____, un (expediente) o (tarjeta(s)) de la División de Inteligencia de la Policía de Puerto Rico sobre mi persona que lleva el número _____el que consta de_____ folios, así como los siguientes documentos u objetos:_____

_____
_____.

_____
FIRMA

_____
LUGAR

_____
FIRMA DE LA PERSONA
QUE ENTREGO EL EXPE-
   DIENTE"

5.2) En la eventualidad de que el Estado haya retenido algunos folios del expediente porque se propone formular al Tribunal un reclamo de confidencialidad, en tal situación el recibo debe indicar los números de los folios que fueron retenidos con tal propósito.

5.3) El recibo se hará en original y una sola copia. La copia será entregada a la persona que recoja la(s) tarjeta(s) o el expediente y el original será remitido al Tribunal para su posterior destrucción.

5.4) El Tribunal retendrá el original del recibo por un período de un año a contar del momento de la entrega del expediente, y expirado el término dicho documento será destruido.

*Regla 6.- [I]nvocación de privilegio sobre información oficial:*

6.1) Disposiciones Generales.

El Estado ha informado a este Tribunal que se propone radicar un gran número de peticiones reclamando confidencialidad sobre hechos y datos que constan en los expedientes abiertos ilegalmente por la División de Inteligencia de la Policía de Puerto Rico y cuya entrega a las personas concernidas se ha decretado en este pleito.

La mayor parte de estas solicitudes girarán en torno para que se suprima de los mismos la identidad de los agentes encubiertos involucrados en la investigación de las personas y entidades sujeto del expediente, así como la identidad de terceras personas.

Con el propósito de evitar esa anunciada avalancha de peticiones de reclamos de confidencialidad, las que tendrían el efecto de retrasar la entrega de información a la persona sujeto del expediente y congestionar innecesariamente el calendario de este Tribunal, consideramos prudente en esta etapa de los procedimientos que el Tribunal fije su posición con relación a los méritos de tales solicitudes.

Si bien es cierto que dicha información no es la *información oficial* que contempla el privilegio que establece la[s] Regla[s] 31 y 32 de las de Evidencia y la Jurisprudencia no es menos cierto que permitir la divulgación de los nombres de esas personas podría poner en peligro la vida y seguridad de las mismas.

No consideramos justo ni razonable poner en peligro la vida y seguridad de los agentes, así como la de las fuentes de información, por cuanto estas personas se limitaban a seguir instrucciones de sus superiores. El Estado ha confesado su culpabilidad por esta nefasta práctica declarada inconstitucional y la persona que resulte lesionada como consecuencia de la misma, en su día le podrá reclamar al Estado resarcimiento por los daños y perjuicios sufridos.

Por lo anteriormente indicado y en vista de ese interés legítimo del Estado, se dispone que el Estado podrá excluir

con tinta indeleble de los documentos única y exclusivamente los nombres de los agentes involucrados y los nombres de las personas de las fuentes de información.

6.2) El Estado informó también que otros reclamos de confidencialidad podrían referirse a aquellos expedientes abiertos inicialmente por motivo de ideas políticas y que en el curso de la investigación del sujeto del expediente se descubrió que éste era sospechoso de estar involucrado en actividades criminales, *habiendo prescrito en este momento el delito en cuestión.*

Nuevamente aclaramos y reiteramos que las investigaciones criminales en proceso están exclu[i]das del alcance de esta Sentencia.

Con relación a este tipo de reclamo de confidencialidad o sea, hechos que dan lugar a que se levante una sospecha contra la persona por ser los mismos de naturaleza delictiv[a] y por cuyos hechos nunca se llegó a formular una denuncia o acusación estando ya prescrito el delito en cuestión, adelantamos el siguiente criterio judicial con el mismo propósito expresado anteriormente, a saber, expeditar los procedimientos de entrega de expedientes y evitar la radicación judicial de tales reclamos de confidencialidad. Veamos.

Toda aquella información y documentos obtenidos por el Estado subrepticiamente a través de actos y actividades claramente ilegales, constituye el prototipo de evidencia inadmisible en los tribunales en virtud del mandato constitucional dispuesto en la Sección 10 del Artículo 2 de la Constitución del Estado Libre Asociado de Puerto Rico.

Dado el hecho de que la Policía no tiene ningún derecho a montar una vigilancia a un ciudadano por el hecho de ser éste independentista o socialista, es obvio que no tiene derecho a obtener, ni menos aún retener información o documentos obtenidos por medio de estas actividades.

Si una agencia del gobierno posee documentos e información obtenidos por medios ilegales, el Tribunal tiene poder en equidad para conceder remedios interdictales con relación a esos documentos e información, si su conservación por parte de la agencia no sirve ningún propósito legítimo[,] y también para vindicar el derecho de la parte afectada. *Paton vs. L[a P]rade*, 524 F.2d. 862, 868–[8]69 (3d Cir. 1975). *Chastain vs. Kelley*, 510 F.2d. 1232, 1236 (D.C. Cir. 1975).

Determinamos que conservar dicha información no sirve ningún propósito legítimo máxime cuando el delito alegadamente infringido por la alegada sospecha de conducta delictiva ha prescrito y que la mejor forma de disponer permanentemente de esa información es su entrega a la persona concernida.

Cualquier uso o diseminación que el Estado pueda hacer con este material, estaría manchado de ilegalidad por razón de que dicha información no llegó a manos del gobierno legalmente.

Si la ley autoriza la eliminación del r[é]cord penal de una persona convicta de todos los delitos menos grave[s] y de algunos delitos graves una vez transcurrido determinado período de tiempo desde la fecha de la convicción, con más razón debe proceder la eliminación permanente de todo r[é]cord oficial de cualquier documento o información obtenidos por el Estado de manera ilegal y por los que nunca se llegó a formular denuncia o acusación estando prescrito el delito alegadamente infringido por la conducta sospechosa.

Cualquier otro reclamo de confidencialidad por información oficial no comprendido entre los anteriormente indicados y mencionados por el Estado deberán estar reconocidos por la ley y la jurisprudencia.

6.3) Cuando el Estado se proponga formular un reclamo de confidencialidad, radicará en el Tribunal en sobre lacrado solamente el folio que contiene la información cuya sustracción del escrutinio público se solicita.

Dentro del referido sobre lacrado se incluirá un Memorando de Derecho en apoyo del reclamo de confidencialidad.

6.4) De radicarse un reclamo de confidencialidad, el Estado notificará al sujeto del expediente únicamente el hecho de la radicación de dicha solicitud y que eventualmente el Tribunal resolverá si procede o no la misma.

6.5) De proceder el reclamo de confidencialidad y una vez advenga final y firme la resolución del Tribunal, se procederá a eliminar la información oficial del documento con tinta negra indeleble y/o el documento en su totalidad será destruido en la eventualidad de que [é]ste no contenga otra información que amerite ser entregada.

*Regla 7.- Remisión al Tribunal de las tarjetas y expedientes no reclamados*:

7.1) Todas aquellas tarjetas y expedientes no entregados a los sujetos de los mismos y/o a sus familiares, en la eventualidad de que el sujeto del expediente haya fallecido, serán remitidos al Tribunal para su destrucción posterior, al finalizar el término concedido al Estado para cumplir con la Sentencia y el que se indica más adelante.

7.2) Una vez radicad[as] dichas tarjetas y cartapacios en la Secretaría de este Tribunal, éstos serán trasladados inmediatamente al Archivo Confidencial del Archivo Central de la Rama Judicial donde se mantendrán no accesibles al público y separado[s] de otros documentos y se conservarán en dicho lugar hasta que el Juez Presidente determine su disposición conforme lo dispone la Regla 16 de las Reglas para la Administración del Programa de Conservación [y] Disposición de Documentos de la Rama Judicial, aprobadas por el Tribunal Supremo, el día 7 de noviembre de 1975, de acuerdo a la autorización conferídale por la Sección 7 del Artículo V de la Constitución del Estado Libre Asociado de Puerto Rico (L.P.R.A. Vol. 1) y las disposiciones y propósitos de la Sección 4 de la Ley Número 11 de 24 de julio de 1952, conocida como la Ley de la Judicatura del Estado Libre Asociado de Puerto Rico (4 L.P.R.A. [s]ec. 302) y de la Ley Número 5 de 8 de diciembre de 1955, según enmendada, conocida como la Ley de Administración de Documentos Públicos de Puerto Rico (32 L.P.R.A. [s]ec[s]. 1001 a 1013).

*Regla 8.- Radicación en la Secretaría del Tribunal en sobre lacrado de un índice de las personas y entidades con tarjetas y expedientes y/o carpetas en la División de Inteligencia de la Policía de Puerto Rico.*

8.1) Dentro de los próximos sesenta (60) días a partir de la fecha de notificación de la presente Sentencia, la parte demandada radicará en la Secretaría de este Tribunal en sobre lacrado un índice en orden alfabético y numérico de las personas con tarjeta(s) en la División de Inteligencia de la Policía de Puerto Rico.

8.2) Dentro del mismo plazo de tiempo indicado en la Regla 8.1 anterior, la parte demandada radicará separadamente en sobre lacrado un índice en orden alfabético y numérico de las personas y entidades a las que se les abrió un expediente o cartapacio en la División de Inteligencia de la Policía de Puerto Rico, disponiéndose que estas personas o entidades no serán inclu[i]das en el índice de personas o entidades con tarjetas.

8.3) Los referidos índices constituirán un mecanismo de comprobación del cumplimiento de la Sentencia en lo que respecta a la disposición permanente de las tarjetas y expedientes abiertos ilegalmente por la División de Inteligencia de la Policía de Puerto Rico.

*Regla 9.- Término que dispone el Estado para cumplir con el remedio de la Sentencia de entrega de tarjetas y expedientes a las personas concernidas:*

9.1) La parte demandada deberá entregar todas las tarjetas y expedientes a que se refiere esta Sentencia dentro del plazo de seis (6) meses a partir de la fecha de notificación de esta Sentencia.

9.2) El referido plazo solamente podrá ser prorrogado mediante solicitud por escrito en la que se deberá exponer los fundamentos para tal solicitud.

*Regla 10.- Mecanismo de supervisión para asegurar el cumplimiento de la Sentencia:*

10.1) El Tribunal designará a un Monitor, de ser ello necesario, quien se encargará de informar al Tribunal si el Estado está o no cumpliendo adecuadamente con la Sentencia.

10.2) Mientras no se efectúe la referida designación del Monitor, la parte demandada rendirá informes al Tribunal cada quince (15) días, a partir de la fecha de notificación de la presente Sentencia, en los que informará detalladamente el estado de progreso del cumplimiento de la Sentencia. (Énfasis

en el texto original suprimido en parte y escolios omitidos.)
Caso Núm. CE-87-665, Parte I, Apéndice II, págs. 12–29.(*)

El 5 de noviembre de 1987 admitimos la apelación de los demandados. El 10 de diciembre de 1987 ordenamos la paralización de los efectos de las sentencias apeladas y de los procedimientos ante el Tribunal Superior. En reconsideración emitimos, el 10 de febrero de 1988, la resolución siguiente:

*Y tercero*, reevaluada nuevamente la *Moción en Auxilio de Jurisdicción* del apelado Noriega Rodríguez, se reconsidera nuestra Resolución del 10 de diciembre de 1987 y se ordena a los demandados apelantes, que en aras de garantizar la pureza de los procedimientos y como salvaguarda adicional, procedan a cumplir con lo dispuesto en la Regla 8 de la sentencia apelada de fecha 14 de septiembre de 1987. Deberán además adoptar las medidas necesarias para que los originales de las tarjetas y carpetas en posesión de la Policía estén debidamente protegidas contra cualquier daño o menoscabo.

Los sobres lacrados que deberán contener las dos listas conforme la referida Regla 8, permanecerán bajo la custodia del foro de instancia hasta tanto este Tribunal disponga expresamente sobre el particular.

Para el cumplimiento de lo dispuesto en la Regla 8, se concede un término de treinta (30) días a partir de la presente resolución. Caso Núm. CE-87-665, Parte II, Resolución de 10 de febrero de 1988, págs. 1–2.

## II

El Procurador General levanta los siguientes errores que a su juicio cometió el tribunal de instancia:

1. Incidió el tribunal de instancia al ordenar la entrega de documentos de la Policía de Puerto Rico y dictaminar otros

(*) Nota de la Compiladora:

Mediante Resolución de 10 de enero de 1989, vista la solicitud del demandante y apelado David Noriega Rodríguez, el Tribunal enmendó esta opinión mayoritaria para añadir el párrafo tercero y siguientes de la Regla 6.2, y las Reglas 6.3 a 10 de las establecidas por el tribunal de instancia.

remedios que afectan los derechos de terceras personas que no son parte en el pleito, quienes no han sido notificadas, ni están adecuadamente representadas, ni han tenido una oportunidad adecuada de ser oídos, todo ello en clara y patente violación del debido procedimiento de ley que le garantiza a dichas personas la Constitución de Puerto Rico, Artículo II, Sec. 7.

2. Incidió el tribunal de instancia al obligar a los apelantes a litigar con terceras personas ajenas al pleito sin certificar un pleito de clase, poniendo así a los apelantes en inminente peligro de ser demandados por violar los derechos de dichas terceras personas que no se han sometido a la jurisdicción del tribunal ni han dado su anuencia a la entrega de dicha información, todo ello en clara y patente violación del derecho a un debido procedimiento de ley que garantiza la Constitución de Puerto Rico, Art. II, Sec. 7.

3. Incidió el tribunal de instancia al dictar sentencia a favor de terceras personas ajenas al presente litigio a pesar de que no tenía autoridad para ello y en clara y patente violación a los principios de justiciabilidad y de caso y controversia que informan el ejercicio del poder judicial establecido bajo el Artículo V de la Constitución de Puerto Rico.

4. Incidió el tribunal de instancia al dictar sentencia a favor de terceras personas ajenas al presente litigio a pesar [de] que no tenía autoridad para ello y en clara violación de la doctrina de jurisdicción primaria, toda vez que los terceros ausentes ni alegaron ni probaron hechos que delaten un agravio de patente intensidad que justificara el ejercicio de la jurisdicción del tribunal bajo la Ley Núm. 12 de 8 de agosto de 1976, 32 L.P.R.A. sec. 3524, para suplantar la jurisdicción del Consejo creado mediante la Orden Ejecutiva para atender estos asuntos.

5. Incidió el tribunal de instancia al dictar sentencia que afecta las facultades constitucionales del Gobernador de Puerto Rico bajo el Artículo IV de la Constitución de Puerto Rico, anulando sin justificación alguna actos legítimos del Primer Ejecutivo al promulgar la Orden Ejecutiva.

6. Incidió el tribunal de instancia al anular la Orden Ejecutiva sin que nadie lo solicitara y en ausencia de prueba alguna que dicha Orden afectaba los derechos de las partes recla-

mantes en esta acción, procediendo erróneamente a sustituir el criterio del tribunal por el del Primer Ejecutivo e iniciar un procedimiento de carácter legislativo para instituir un complejo procedimiento y una complicada maquinaria bajo la supervisión del tribunal para disponer de información recopilada por la Policía de Puerto Rico, todo ello en clara y patente violación de los principios de separación de poderes que constituyen los cimientos fundamentales en que se asienta nuestro orden constitucional.

7. Incidió el tribunal de instancia al diseñar un remedio a favor de terceros ausentes del presente litigio consistente en la promulgación de un conjunto de reglas que 1) resuelven prematuramente los méritos de las posibles reclamaciones de confidencialidad que el tribunal por adelantado supone que los apelantes puedan hacer en el futuro sobre diversos expedientes o folios; 2) que fijan la posición del tribunal respecto a los méritos, adelantando los criterios que el tribunal va a utilizar al determinar sobre aquellos expedientes que contengan folios que contienen información sobre actividades delictivas; 3) que obligan al Gobierno a destruir documentos oficiales sin que el tribunal haya considerado y evaluado, a la luz de la evidencia en cuanto a la verdadera información allí contenida, el valor que [é]stos puedan tener para la administración de la justicia, la seguridad pública o la historia de nuestro país; 4) que se precipitan a ordenar dicha destrucción sin prestar atención a las leyes y reglamentos que regulan la disposición de documentos públicos; 5) que impiden que los apelantes retengan los originales de documentos que podrían necesitar para defenderse de posibles reclamaciones de daños y 6) que requieren, so pena de desacato, que los apelantes completen todo este trámite en un término de seis (6) meses, lo que implicaría que el Gobierno tendría que dedicar valiosos recursos escasos para atender exclusivamente los requerimientos de esta sentencia. Caso Núm. CE-87-665, Parte I, Escrito de apelación o solicitud de revisión, págs. 18–20.

## III

Por ser un elemento común a todos los señalamientos de error y resultar decisivo en la disposición final

del recurso, es preciso referirnos, aunque brevemente, a las fuentes del derecho que gobiernan nuestra determinación. En *Collazo Cartagena v. Hernández Colón*, 103 D.P.R. 870, 874 (1975), fijamos el orden jerárquico de las normas vigentes en nuestro ordenamiento y de la prelación de las fuentes del Derecho:

(1) [L]a Constitución de Puerto Rico; (2) las leyes aprobadas por la Asamblea Legislativa; (3) las reglas y reglamentos aprobados y promulgados bajo autoridad de ley por los organismos públicos[,] y (4) las ordenanzas municipales. Cuando no haya ley aplicable al caso, el tribunal resolverá conforme a equidad, que quiere decir que se tendrá en cuenta la razón natural de acuerdo con los principios generales del derecho, y los usos y costumbres aceptados y establecidos, según dispone al Art. 7 del Código Civil, 31 L.P.R.A. sec. 7.

De manera que al resolver este caso debemos atenernos, en primer lugar, a la Constitución del Estado Libre Asociado de Puerto Rico. Como expresáramos anteriormente, el *issue* fundamental ante nos es determinar cuáles son los remedios adecuados para vindicar los derechos constitucionales de miles de ciudadanos y entidades que han sido violados por el Estado durante varias décadas.

Ante esa situación, el Estado quiere anteponer reglas procesales y la doctrina de la jurisdicción primaria, así como la de agotamiento de remedios administrativos. No debe haber duda sobre cuál es la prelación. Tiene que ser la Constitución. Véase, además, a esos efectos, *P.I.P. v. C.E.E.*, 120 D.P.R. 580, 612 (1988), donde reafirmamos que:

Ahora bien, la Constitución, cuerpo de normas supremas, se impone a la legislación ordinaria. Dicho documento, que constituye nuestro proyecto de vida en comunidad, otorga a la Rama Judicial amplios poderes para examinar actuaciones alegadamente inconstitucionales del Poder Legislativo o Ejecutivo al amparo de la relación dinámica de la separación de poderes. *Silva v. Hernández Agosto*, 118 D.P.R. 45 (1986); *Santa Aponte v. Srio. del Senado*, 105 D.P.R. 750 (1977).

■ Aunque utilizada en otro contexto, es norma obligatoria y fundamental que:

En el caso particular de legislación cuyo fin primordial es remediar los efectos adversos de una actuación inconstitucional, debemos favorecer una interpretación que resulte en una mejor protección de los derechos humanos. Debemos siempre tener presente que todas las leyes de justicia social "deben ser liberalmente interpretadas, a fin de poder lograr los elevados fines perseguidos por el legislador". *García Pagán v. Shiley Caribbean etc.*, 122 D.P.R. 193, 209 (1988). Véase *Torres v. González*, 63 D.P.R. 964, 972 (1944).

Por eso reafirmamos que, al resolver este pleito, tenemos que darle prelación a la vindicación de los derechos constitucionales de las 74,000 personas afectadas. Para ello debemos decidir dónde estarán en última instancia mejor protegidos esos derechos: ¿a través del Consejo para la Protección del Derecho a la Intimidad de los Ciudadanos y para la Seguridad de las Personas y del Estado Libre Asociado de Puerto Rico (Consejo) creado, organizado e implantado por el Poder Ejecutivo o por los tribunales mediante el remedio de *injunction* diseñado por el tribunal de instancia, según éste pueda ser, de ser procedente, modificado prospectivamente?

## IV

Al considerar los planteamientos ante nos, hay que tener en mente que lo que se cuestiona es el alcance del *injunction* permanente emitido para poner en vigor una sentencia declaratoria consentida por el Estado.

■ De todos es conocido que, especialmente durante la última década, el *injunction* en Puerto Rico se ha convertido en el instrumento más eficaz para vindicar los diversos derechos constitucionales protegidos por nuestra Constitución. M. Velázquez Rivera, *Redescubriendo el Injunction*, 1 Forum 18 (1985). El auto está inexorablemente atado a su

abolengo de equidad, *A.P.P.R. v. Tribunal Superior*, 103 D.P.R. 903, 908 (1975); "es el brazo enérgico de la justicia para la protección de los ciudadanos contra los desmanes de los funcionarios públicos que actuando so color de autoridad les causan daño irreparable", *Ortega Cabrera v. Tribunal Superior*, 101 D.P.R. 612, 618 (1973); sirve para proteger los derechos humanos, *Pierson Muller I v. Feijoó*, 106 D.P.R. 838 (1978); *Otero Martínez v. Gobernador*, 106 D.P.R. 552 (1977), y "se caracteriza por su perentoriedad, por su acción dirigida a evitar un daño inminente o a restablecer el régimen de ley conculcado por conducta opresiva, ilegal o violenta del transgresor del orden jurídico". *Peña v. Federación de Esgrima de P.R.*, 108 D.P.R. 147, 154 (1978).

■ Ya hemos visto que estamos ante violaciones crasas durante varias décadas de una pléyade de derechos de la ciudadanía. Entre otros, la indebida intervención del ejecutivo en la vida familiar y en la intimidad de estos ciudadanos. Estas infracciones son remediables mediante el recurso de *injunction. Colón v. Romero Barceló*, 112 D.P.R. 573 (1982).

■ En cuanto a expedientes, listas, ficheros y documentos obtenidos ilegalmente por el Estado, se ha reconocido el poder en equidad de los tribunales para intervenir. A esos efectos, en *Socialist Workers Party v. Attorney General of U.S.*, 666 F. Supp. 621, 623 (S.D.N.Y. 1987), se resolvió:

> Where a governmental agency possesses records and documents obtained or generated illegally, the court has the equitable power to vindicate and protect the rights of parties affected. Expungement is one possible tool to accomplish this. Another device is to place restrictions on the use of the materials. See *Chastain v. Kelley*, 510 F.2d 1232, 1235 (D.C. Cir. 1975).
>
> The Government contends that there should be no injunctive relief because there is no threat of future unconstitutional use of the illegally obtained information —such as use in a

disruption program. But this ignores the fact that any use or dissemination of this material would be tainted with illegality because the information is not lawfully in the hands of the Government.

Y en *Paton v. La Prade*, 524 F.2d 862, 868–869 (3er Cir. 1975), se sigue la norma de que:

Our conclusion that Paton has standing, of course, does not establish that she is entitled to the relief she seeks. Determination of the propriety of an order directing expungement involves a balancing of interests; the harm caused to an individual by the existence of any records must be weighed against the utility to the Government of their maintenance. See *United States v. Linn*, 513 F.2d 925 (10th Cir. 1975); *Chastain v. Kelley*, 510 F.2d 1232 (D.C. Cir. 1975); *Tarlton v. Saxbe*, 165 U.S. App. D.C. 293, 507 F.2d 1116 (D.C. Cir. 1974); *Menard v. Saxbe*, 162 U.S. App. D.C. 284, 498 F.2d 1017 (1974); *Sullivan v. Murphy*, 156 U.S. App. D.C. 28, 478 F.2d 938, *cert.* denied, 414 U.S. 880, 94 S. Ct. 162, 38 L. Ed. 2d 125 (1973); *Menard v. Mitchell*, 139 U.S. App. D.C. 113, 430 F.2d 486 (1970). Factors to be weighed in balancing are the accuracy and adverse nature of the information, the availability and scope of dissemination of the records, the legality of the methods by which the information was compiled, the existence of statutes authorizing the compilation and maintenance, and prohibiting the destruction, of the records, and the value of the records to the Government.

Esas son las normas sustantivas que rigen el *injunction* en estos casos. En lo procesal, reafirmamos que las Reglas de Procedimiento Civil sólo aplican de modo supletorio siempre y cuando no desvirtúen el carácter sumario del recurso. *Corujo Collazo v. Viera Martínez*, 111 D.P.R. 552 (1981).

Con ese trasfondo procedemos a resolver el recurso.

V

En sus primeros tres (3) señalamientos el Estado cuestiona que se hayan concedido remedios a terceros ausentes

sin que se hubiera certificado una acción de clase y sin que se haya seguido el debido proceso de ley.

No hay duda de que la acción de clase constituye un mecanismo de representación de gran utilidad. Entre otras cosas, permite la representación de un nutrido grupo de personas con reclamaciones típicas fundadas en los mismos hechos o cuestiones de derecho, fomenta la economía judicial y protege a las partes de sentencias incongruentes. *Cuadrado Carrión v. Romero Barceló*, 120 D.P.R. 434 (1988).

Ya hemos visto el historial del caso. La declaración de inconstitucionalidad de la práctica ilegal beneficia a todos aquellos colocados en una situación análoga. Asimismo el Estado consintió y se comprometió a abstenerse permanentemente de la práctica ilegal. No hay controversia de que únicamente el Estado es el que conoce cuáles son las 74,000 personas y entidades que aparecen ilegalmente fichadas en los expedientes y listas que han preparado en forma inconstitucional durante largos años. Los demandantes no tienen forma efectiva de conocer quiénes son los afectados para poder traerlos al pleito. Bajo esas circunstancias resolvemos que la certificación como pleito de clase resulta improcedente y onerosa.

Ante la declaración de inconstitucionalidad que confirmamos hoy, es claramente aplicable la norma que adoptamos en *Ortiz Angleró v. Barreto Pérez*, 110 D.P.R. 84, 93 (1980): "Respecto a la alegación de si este pleito es o no un pleito de clase, valga decir que es innecesario que nos pronunciemos sobre el particular. El pleito es sostenible como una petición de sentencia declaratoria e interdicto por personas claramente afectadas por la ley aquí cuestionada."

Además, por su propia naturaleza, este es un asunto de profundo interés público en el que deben abor-

darse varias disposiciones constitucionales que afectan y protegen a la comunidad en general. *Fuster v. Busó*, 102 D.P.R. 327 (1974). Como apunta un ilustrado tratadista, las decisiones del Tribunal Supremo son, por lo menos en casos constitucionales, acciones de clase de facto. A.S. Miller, *Constitutional Decisions as De Facto Class Actions, A Comment on the Implications of Cooper v. Aaron*, 58 U. Det. J. Urb. L. 573–586 (1981). Señala el autor que, en estos casos, la función del Tribunal es exponer lo que la ley debe ser no sólo para los litigantes, sino para la nación en su totalidad. Íd., pág. 583. Una vez sentada la norma obligatoria en todo nuestro sistema, es innecesario complicar el pleito para iniciar el largo y técnico trámite de una acción de clase. Como acertadamente se señala en el alegato del apelado Noriega, "[l]as razones son de índole pragmático: soluciones justas, rápidas y económicas a agravios ilegales e inconstitucionales de patente intensidad". Alegato de la parte demandante apelada representante David Noriega Rodríguez, pág. 61.

■ Bajo las circunstancias presentes, es permisible que se invoquen y consideren los derechos de los terceros ausentes. *Zachry International v. Tribunal Superior*, 104 D.P.R. 267 (1975). No comprendemos la contención del Estado de que el mecanismo implantado por el tribunal les afecta sin que se haya seguido el debido proceso de ley. Todo lo contrario; sus derechos sustantivos y procesales están ampliamente garantizados y protegidos. Por otro lado, estos terceros ausentes no se encuentran en una posición ideal para hacer valer sus derechos. Los demandantes están en posición adecuada de invocar y defender sus derechos y el tribunal tiene el mecanismo adecuado para hacerlos valer. Bajo las circunstancias presentes, se cumplen con todos los requisitos para permitir la intervención del tribunal en beneficio de terceros. *E.L.A. v. P.R. Tel. Co.*, 114 D.P.R. 394

(1983); *Zachry International v. Tribunal Superior*, ante. Para un elaborado compendio y comentario de las normas prevalecientes, véase R. Serrano Geyls, *Derecho constitucional de Estados Unidos y Puerto Rico*, San Juan, Ed. C. Abo. P.R., 1986, Vol. 1, págs. 170–194.

## VI

El Estado invoca la doctrina de jurisdicción primaria para sostener que corresponde al Consejo dilucidar todo lo relativo a la entrega de los expedientes y los reclamos de confidencialidad.

El planteamiento, además de sorprendente, es claramente frívolo. Si en algún caso hay un agravio de patente intensidad al derecho del individuo que reclame urgente reparación y que se eluda el cauce administrativo, es el presente. *Pierson Muller I v. Feijoó*, ante.

## VII

El Estado trae a colación la doctrina sobre caso y controversia para sostener que, habiéndose terminado la controversia entre el Estado y los demandantes originales, el pleito se ha tornado académico. No le asiste la razón.

En fecha tan reciente como el 21 de abril de 1988 tuvimos la oportunidad de acopiar la jurisprudencia más relevante en torno a esta doctrina. A esos efectos, en *El Vocero v. Junta de Planificación*, 121 D.P.R. 115, 123–124 (1988), resolvimos que:

> Los tribunales de justicia existen para resolver controversias genuinas surgidas entre partes opuestas que tengan un interés real en obtener un remedio que haya de afectar sus relaciones jurídicas. *Com. de la Mujer v. Srio. de Justicia*, 109 D.P.R. 715 (1980); *E.L.A. v. Aguayo*, 80 D.P.R. 552 (1958).
>
> En *E.L.A. v. Aguayo*, supra, pág. 584, expusimos lo que constituye un caso académico, citando de *Ex parte Steele*, 162 F. 694, 701 (N.D. Ala. 1908):

". . . que un caso académico . . . es 'uno en que se trata de obtener un fallo sobre una controversia disfrazada, que en realidad no existe, o una determinación de un derecho antes que éste haya sido reclamado, o una sentencia sobre un asunto, que al dictarse, por alguna razón *no podrá tener efectos prácticos sobre una controversia existente*'. (Énfasis suplido.)"

El concepto de academicidad recoge la situación en que, aun cumplidos todos los requisitos de justiciabilidad, los cambios fácticos o judiciales acaecidos durante el trámite judicial de una controversia tornan en académica o ficticia su solución. Los fundamentos en que se apoya dicha doctrina son: "(1) evitar el uso innecesario de los recursos judiciales; (2) asegurar [la existencia de] suficiente contienda adversativa sobre las controversias para que sean competentes y vigorosamente presentad[as ambas partes]; y (3) evitar un precedente innecesario." *Com. de la Mujer v. Srio. de Justicia*, supra, pág. 725.

Se han elaborado también una serie de excepciones a la aplicación de la doctrina de academicidad. Éstas cobran vigencia en aquellos casos en los que, aun cuando la decisión del tribunal no afecta a las partes involucradas, presenta una cuestión recurrente o repetitiva del asunto planteado —*Roe v. Wade*, 410 U.S. 113 (1973); *Moore v. Ogilvie*, 394 U.S. 814 (1969); *(So. Pac. Terminal Co. v. Int. Comm. Comm.*, 219 U.S. 498 (1911)— en aquellos casos en que la propia parte demandante termina voluntariamente su conducta ilegal —*Com. de la Mujer v. Srio de Justicia,* supra; *City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283 (1982)— y en aquellos donde la situación de hechos ha sido cambiada voluntariamente por el demandado, pero que no tiene visos de permanencia, *United States v. W.T. Grant Co.*, 345 U.S. 629 (1953). De igual manera se plantea una excepción cuando en un caso se ha certificado por el tribunal una clase, de conformidad con la Regla 20 de Procedimiento Civil de 1979 (32 L.P.R.A. Ap. III), y la controversia se torna académica para un miembro de la clase, mas no para el representante de la misma, *Sosna v. Iowa*, 419 U.S. 393 (1975); *Franks v. Bowman Transportation Co.*, 424 U.S. 747 (1976), y en los casos que aparentan ser académicos[,] pero en realidad no lo son por sus consecuencias colaterales.

R. Serrano Geyls, *Derecho Constitucional de Estados Unidos y Puerto Rico*, San Juan, Ed. C. Abo. P.R., 1986, Vol. 1, págs. 122–126; L.H. Tribe, *American Constitutional Law*, 2da ed., Nueva York, The Foundation Press, 1988.

■ A ello sólo tenemos que añadir que este caso no puede ser académico por una sencilla razón. Si se deja trunca, sin un remedio adecuado, la declaración de inconstitucionalidad de la práctica que el propio Estado reconoce es ilegal, la sentencia carecería de toda efectividad. Hay una controversia latente que amerita pronta resolución. Rehusar resolverla atentaría contra los postulados básicos que rigen las funciones de los tribunales de justicia.(2)

## VII

Nos dirigimos ahora a la impugnación del Estado al remedio concedido por el tribunal de instancia.

■ Hemos examinado el remedio elaborado por el tribunal. El mismo es detallado y particularizado. Es el resultado de un análisis ponderado, sereno y juicioso de la situación ante sí y de las alternativas viables para corregirla. Mentes razonables, objetivas e imparciales podrán discrepar de algunas de ellas. De ser así y el tribunal de instancia quedar convencido de que algunas de ellas ameritan descartarse, modificarse o ampliarse, conserva la facultad de así hacerlo. Ello es así ya que el *injunction* es un remedio dinámico sobre el cual los tribunales siempre conservan jurisdicción para dejarlo sin efecto o modificarlo a favor o en contra del que resulta obligado. Véanse, al respecto: *Peña v. Federación de Esgrima de P.R.*, ante; *Ríos v. Municipio de San Sebastián*, 106 D.P.R. 172 (1977).

---

(2) No hay duda de que el representante Noriega tiene capacidad para demandar y mantenerse como parte en el pleito. *Hernández Agosto v. Romero Barceló*, 112 D.P.R. 407 (1982); R. Serrano Geyls, *Derecho constitucional de Estados Unidos y Puerto Rico*, San Juan, Ed. C. Abo. P.R., 1986, Vol. 1, págs. 129–195.

Lo que sí es claro es que el remedio no atenta contra ni resulta ser contrario a la doctrina de separación de poderes. El mero hecho de que en este momento no dejemos la solución del problema en las manos exclusivas del Poder Ejecutivo no implica que estemos usurpando sus poderes. Después de todo, bajo la doctrina de separación de poderes éstos no son absolutos. *Morrison v. Olson*, 487 U.S. 654 (1988); *P.I.P. v. E.L.A.*, ante; *Silva v. Hernández Agosto*, 118 D.P.R. 45 (1986); *Santa Aponte v. Srio. del Senado*, 105 D.P.R. 750 (1977); Serrano Geyls, *op. cit.*, Cap. VII, pág. 571 y ss.

En el caso ante nos, de permitirse que sea el Consejo el que exclusivamente diseñe, implante y juzgue la naturaleza del remedio a que deban tener derecho las personas a quienes el propio Estado conculcó sus derechos, se estaría violentando un principio fundamental. Como resolviéramos en *Silva v. Hernández Agosto*, ante, pág. 55, "[n]uestra estructura de gobierno no permite que las ramas políticas del Gobierno se conviertan en árbitros de sus propios actos". Sin que ello implique desconfianza en la buena fe de la administración actual del Gobierno, eso precisamente es lo que se pretende lograr con este recurso. Hay que considerar, además, que la intervención judicial con las decisiones del Consejo es sumamente limitada. Como señala el tribunal, en caso de no seguirse las guías establecidas por el Consejo, no hay lugar para una acción penal contra el funcionario que así actúe. Es significativo, además, que la Rama Legislativa queda desprovista de toda injerencia e intervención con las funciones del Consejo.

De revocarse la sentencia y dejar incólume el Consejo para implantar los remedios, estaríamos propiciando un estado de desconfianza y sospecha en las 74,000 personas directamente afectadas y en el resto de la ciudadanía que cree y sostiene un gobierno democrático que debe en todo mo-

mento respetar y resguardar los derechos fundamentales que rigen nuestra convivencia social.(3)

En conclusión, el *injunction* ofrece mayores garantías a los afectados y a la ciudadanía en general que las sugeridas por el Estado.

## VIII

En cuanto al remedio concedido en la sentencia de 14 de septiembre de 1987, no hay fundamento para intervenir con la discreción del tribunal de instancia.

Las reglas que promulgó el tribunal para hacer viable la entrega de los expedientes abiertos ilegalmente son vías para lograr el propósito fundamental de la sentencia: eliminar la práctica ilegal antes señalada.

En cuanto a las reglas, le toca, en primera instancia, al Poder Ejecutivo cumplir con los detalles de notificación, entrega y disposición final. El tribunal supervisará el progreso mediante los informes que deberán suministrársele cada quince (15) días. Además, será función del tribunal adjudicar los reclamos de confidencialidad que puedan levantarse por el Estado.(4) Por otro lado, aquellos que están incluidos en las listas, ficheros y expedientes podrán acudir al tribunal para reclamar sus derechos en torno al procedimiento de entrega y disposición de los documentos.

Los autos reflejan que el magistrado les dio múltiples oportunidades a los apelantes para que, por vía de estipulación o por petición directa, le proveyeran un diseño pormenorizado que resultara adecuado y eficaz para proteger los derechos afectados y que, a su vez, no resultara gravoso y

---

(3) Nada impide que el Poder Ejecutivo utilice al Consejo como un mecanismo externo para hacer viable el remedio judicial, buscar formas de mejorarlo y lograr un ambiente de cooperación entre todos los concernientes.

(4) Aunque a este momento las guías sobre estos reclamos parecen ser adecuadas y abarcadoras, de surgir problemas no previstos, que requieran la protección de otros terceros, el tribunal intervendrá prontamente.

oneroso para el Estado. Los demandados apelantes optaron por no acceder e insistir en sus planteamientos técnicos procesales y jurisdiccionales. Por esa razón, el tribunal se tuvo que echar sobre sus hombros la delicada tarea que le correspondía a las partes. Entendió que el método más apropiado era promulgar unas reglas detalladas que se asemejaran a un reglamento. Mediante ellas, trató de prever todas las circunstancias que puedan surgir en el futuro. Repetimos que algunas de estas reglas podrían ser demasiado amplias y generales o demasiado detalladas. Pero en respeto a su discreción, nos abstendremos de particularizar y emitir criterios sobre cada una de ellas.

El tribunal atenderá, con carácter prioritario, cualquier moción que presente el Estado para modificar o alterar las reglas promulgadas. El tribunal dará particular énfasis, a solicitud de parte o a instancia propia, a la necesidad de nombrar un panel de comisionados o un comisionado (*monitor*) para velar por que el Estado cumpla, de una manera efectiva, con el mandamiento del tribunal.[5] Por representar partes interesadas y en su condición de funcionarios del tribunal, los abogados de los demandantes y apelados participarán en todos los incidentes futuros que pudieran surgir con el ánimo de, como lo han hecho hasta ahora, cooperar con el tribunal para que se logre un remedio efectivo y práctico en beneficio de todas las partes y del Pueblo de Puerto Rico. Sólo así se podrá cerrar un capítulo, ciertamente no el más preclaro, de nuestra historia colectiva.

A esos efectos *se confirmará la sentencia, pero se devolverá el caso para que continúen los procedimientos.*

Los Jueces Asociados Señores Negrón García y Hernández Denton emitieron opiniones de conformidad.

---

[5] En cuyo caso los gastos y compensaciones de los designados estarán a cargo del Estado.

—O—

Opinión de conformidad emitida por el Juez Asociado Señor Negrón García.

Al suscribir nuestra conformidad con la opinión del Tribunal, confirmatoria de la sentencia del Tribunal Superior, Sala de San Juan (Hon. Arnaldo López Rodríguez, Juez), de 30 de septiembre de 1987, evocamos que el "cincel del legislador o del jurisconsulto trabaja en la carne viva".(1)

A tono con esa realidad, debimos haber acogido y hacer viable el reclamo del demandante y apelado Noriega Rodríguez de resolver y certificar prontamente la decisión en estas apelaciones con suficiente antelación a las elecciones generales de 8 de noviembre de 1988. La legitimidad de ese pedido se desprende diáfanamente del escrito de Noriega Rodríguez denominado "Moción sobre interés público en la adjudicación de la controversia", de 1ro de junio de 1988.(2)

---

(1) Prólogo de Leopoldo Alas a la traducción española de la obra de R. Von Ihering, *La Lucha por el Derecho*, Buenos Aires, Ed. Perrot, 1958, pág. 31.

(2) Las razones justificativas de este trámite prioritario surgen diáfanamente del referido escrito, en específico los párrafos siguientes:

"4. Las partes de epígrafe han sometido sus respectivos alegatos, quedando sometido el caso para decisión final en los méritos el 11 de marzo de 1988.

"5. Está próximo el periodo de receso judicial de este Tribunal que comienza el 30 de junio de 1988 y se extiende hasta el 1ro. de octubre de 1988.

"6. La parte demandante compareciente tiene una seria preocupación de que la congestión del calendario, unido al receso judicial, impida a nuestro Pueblo y a miles de ciudadanos perjudicados por las actuaciones ilegales y ultravires del Estado en autos, conocer el resultado del caso y las implicaciones de la intervención de la maquinaria estatal en todo este asunto, particularmente, de los funcionarios de más alta jerarquía en el Gobierno, antes de las Elecciones del 8 de noviembre de 1988; cuando se enjuicia la gestión gubernamental y se constituye un gobierno democrático del pueblo, para el pueblo y por el pueblo. Cf. *Dávila v. Supt. de Elecciones*, 82 D.P.R. 264, 279 (1960).

"7. Este honorable Tribunal no ha vacilado nunca en dar preferente atención en su calendario a los asuntos revestidos de la mayor importancia e interés público, acortando términos, emitiendo remedios urgentes y a[u]n adoptando decisiones en un plazo relativamente breve cuando las

# I

La génesis que dio paso a la práctica de la Policía de oficialmente levantar, actualizar y preservar expedientes de

circunstancias particulares de un caso lo demandan. Regla 50 del Reglamento del Tribunal Supremo, 4 L.P.R.A., Ap. I-A. *Ortalaza* v. *F.S.E.*, 116 D.P.R. 700, 703-[7]04, escolio 2 (1985[)]. Ello es así po[rq]ue la dilación en el procedimiento judicial frustra el propósito cardinal que lo inspira: *justicia lenta no es justici[a —P]ueblo* v[.] *Pérez Cruz*, 103 D.P.R. 44, 46 (1974)— 'lo cual constituye la política judicial establecida por este foro con miras a lograr una justicia rápida y eficiente'. *Heftler Const. [Co.]* v. *Tribunal Superior*, 103 D.P.R. 844, 846 (1975); *Fine Art Co.* v. *Tribunal Superior*, 102 D.P.R. 451, 455 (1974); *In [r]e Díaz García*, 104 D.P.R. 171, 172 (1975). Véase, Art. 6.1 de la Convención Europea de Derechos Humanos, Mauro Cappelletti, *Fundamentals Guaranties of the Parties in Civil Litigation, Studies in Comparative Law*, Milán, Ed[.] Dott. A Giuffre, 1973, pág. 250.

"8. Toda la población votante de Puerto Rico tiene un legítimo interés en el resultado de este caso, para poder informarse y ejercer consciente e inteligentemente su derecho al voto en las elecciones de 1988, evaluando la conducta y actitud de los gobernantes, sobre aspectos vitales tales como la dignidad del ser humano, la libertad de pensamiento, palabra y asociación, la intimidad y vida privada del ciudadano, derechos seriamente lesionados en autos por las actuaciones del Estado, según ha quedado demostrado en este caso. Como ha señalado este Tribunal, '[l]a premisa es sencilla: Sin conocimiento de hechos no se puede juzgar; tampoco se puede exigir remedios a los agravios gubernamentales mediante los procedimientos judiciales o a través del proceso de las urnas cada cuatro (4) años'. *Soto* v. *Secretari[o d]e Justicia*, 112 D.P.R. 477, 485 (1982); E. Rivera Ramos, *La Libertad de Información: Necesidad de su Reglamentación en Puerto Rico*, XLIV Rev. Jur. U.P.R. Núms. 1–2, pág[s]. 67, 69 (1975).

"9. Existe una alta probabilidad de que pudieran prescribir delitos por violaciones a los derechos civiles, quedando impunes los culpables por un retraso de la justicia, *Pueblo* v. *Oliver Frías*, Res. el 4 de febrero de 1987 (CA-87-7); o que se destruya, manipule o remueva información ilegalmente obtenida en poder del Estado por el simple transcurso del tiempo; frustrándose a su vez el derecho de los perjudicados de obtener un remedio rápido y eficaz en reparación a los agravios de patente intensidad que fueron objeto por las actuaciones ilegales del Estado. *Pierson Muller* v. *Feijoó [I]*, 106 D.P.R. 838, 850–[8]51 (1978); [v]éase, 4 *Diario de Sesiones de la Convención Constituyente* 2564 (1961). El interés público de que no se continúen erosionando estos derechos, a estas alturas ya gravemente vulnerados y socavados, aconseja la más pronta intervención judicial y prevención de cualquier tardanza en resolver la controversia." Caso Núm. CE-87-665, Parte I, Moción sobre interés público en la adjudicación de la controversia, págs. 2–3.

personas —y una lista y tarjeteros como contrarreferencias— fundados *únicamente* en su afiliación o preferencia política, es una cara triste de nuestra historia como Pueblo, matizada por distintos prismas y serias tribulaciones políticas en cuanto al destino incierto de nuestra relación con Estados Unidos.[3] Es *contraria y quebranta* "la fórmula conciliatoria política acuñada oficialmente en la frase Estado Libre Asociado. Más allá de sus voces gramaticales, esta frase es la combinación histórica de los sentimientos vivos tripartitas ideológicos que se respetaron y quedaron incrustados en la Constitución". (Énfasis suprimido.) *P.I.P. v. C.E.E.*, 120 D.P.R. 580, 630 (1988). *Esta práctica constituye un capítulo en el que el país se subdesarrolló constitucionalmente.*

La delicada misión de rescatarla ha correspondido al Poder Judicial. Al hacerlo, nos ha animado el pensamiento de que el jurisprudente orienta "su propia tarea y los instrumentos que maneja hacia preocupaciones que hunden sus raíces en la conciencia social, y *reaccion[a] con aquellos instrumentos para tratar de superar las contradicciones sociales y la perpetuación de las desigualdades.* Descubrirá que la Justicia no es simplemente un dar a cada uno lo suyo, sino interrogarse si en el entorno sociológico en el que está inmerso, *realmente se da a cada uno lo suyo*". (Énfasis suplido.) A. Díaz Suárez, *Los jueces ante la crisis de la justicia*, 523 Rev. Gen. Der. 1669, 1674 (1988).

Atendiendo esa función y la visión piramidal de nuestra Constitución, reafirmamos sin ambages que "[h]a quedado rezagada la época en que el Estado podía cubrir con el manto del misterio y el silencio sus asuntos arbitraria y caprichosamente". *Santiago v. Bobb y El Mundo, Inc.*, 117 D.P.R. 153, 158 (1986); *Soto v. Secretario de Justicia*, 112 D.P.R. 477, 497 (1982).

---

[3] I. Acosta, *La Mordaza*, Río Piedras, Ed. Edil, 1987, págs. 233–238.

Aunque ciertamente convergen en esta apelación múltiples derechos fundamentales, todos repercuten sobre aquel más sagrado y de mayor carga valorativa: la libertad de conciencia que es la voz espiritual más íntima del ser humano. "En nuestra sociedad democrática, el Estado no tiene jurisdicción sobre los dictados de conciencia y sentimientos individuales del ser humano. Solamente cuando los pensamientos y emociones salen del mundo interior de las ideas y se exteriorizan o traducen en acciones que directa o indirectamente *afectan perjudicialmente a otros individuos*, se acepta su participación." (Énfasis suplido.) *Figueroa Ferrer v. E.L.A.*, 107 D.P.R. 250, 281 (1978). Después de todo, la intimidad está inexorablemente vinculada no sólo a la personalidad, sino a la libertad de expresión política, fundamento de una sociedad libre. En este caso, "la gravedad de la invasión a la vida privada del ciudadano se acentúa por la coincidencia de tres elementos: *la posibilidad casi ilimitada de recolección de informaciones personales por parte de instituciones públicas* y privadas, por el rapidísimo acceso al total *complejo de informaciones* obtenidas por su tratamiento por procedimientos *electrónicos de elaboración* y la *elevada circulación* de la información". (Énfasis suplido.) A.M. Romero Coloma, *Derecho a la información y libertad de expresión*, Barcelona, Ed. Bosch, 1984, pág. 8.

## II

Por décadas el Estado, quien paradójicamente era el llamado a promover y mantener la convivencia ordenada y pacífica en el país, ha actuado silenciosamente al margen de la Constitución.

Las llamadas "listas de subversivos" son rémoras para nuestra democracia. Constituyen llaves de acceso oficial a la represión sutil, directa o indirecta, e indiscriminada. Más allá del simple catálogo documental, en su esencia, las listas y ficheros mantienen un estigma humillante y vejatorio que

atenta contra la dignidad, la intimidad y los derechos de expresión y libre asociación de miles de ciudadanos.

Si algún valor decisorio tiene el dictamen judicial de autos, *es detener la práctica de asociar necesariamente al movimiento independentista del país con actos de violencia y conducta criminal*. Aunque no es exclusiva, es contra éste, principalmente, que *la injusticia ha sido grande. No podemos cerrar los ojos.* "'Los Jueces no viven en un vacío. Sabemos lo que el resto de la comunidad sabe.'" *Pueblo v. Marrero*, 79 D.P.R. 649, 658 (1956). A fin de cuentas, "nuestro papel, aunque limitado, no se desarrolla en un *vacío.* Cuando los hechos son suficientemente *abrumadores*, hasta los tribunales pueden tomar conocimiento judicial de los mismos, y de ese modo evitar en parte la censura expresada por Bentham al efecto de que el arte de la jurisprudencia consiste en desconocer metódicamente *lo que todo el mundo sabe*". (Énfasis suplido.) *Ballester v. Tribunal de Apelación*, 61 D.P.R. 474, 507–508 (1943). No es la primera vez que detectamos "la aplicación selectiva y discriminatoria de la ley por razones políticas". *Pueblo v. Arandes de Celis*, 120 D.P.R. 530, 551 (1988). Máxime, cuando el ideario independentista en su gran mayoría ha estado integrado y está constituido por hombres y mujeres honrados, cuyos trabajos y esfuerzos han aportado tanto a nuestro desarrollo material, espiritual, jurídico y cultural.

Esta vieja práctica nunca debió entronizarse. Aunque es típica del fascismo aterrador o de las dictaduras castrantes, en ocasiones ha germinado en países de tradición democrática.(4) Puerto Rico no ha sido la excepción. Constituye una mancha en nuestra vida colectiva de Pueblo que difícilmente

---

(4) Su penetración ha alcanzado jueces que en el descargo de su misión han asumido posiciones contrarias a las de las clases y mayorías ideológicas gobernantes. No es, pues, de extrañarse que haya irrumpido en el recinto judicial de mayor jerarquía federal. Véase *FBI Kept a File on Supreme Court*, The New York Times, 21 de agosto de 1988.

será borrada. Para lograr su erradicación total, evitar su resurgimiento y que no vuelva a prender en las futuras generaciones, merece la más enérgica y unánime condena. Atenta contra los más elementales derechos civiles, humanos y constitucionales. Se presta para persecuciones, cacerías de brujas y para acallar justos reclamos. Equivale a sustituir la ley por la fuerza; la democracia por el totalitarismo. *Ha permitido criminalizar el ideario político de la independencia y convertido la útil facultad investigativa de la Policía — como función legítima disuasiva del delito— en disuasiva de la libertad.* "Los problemas sociales deben resolverse examinando las leyes de la vida, *las que no se comprenden en su verdadera extensión como no sea remontándose a sus fuentes.* El principio de la utilidad social para salvaguardia de los derechos individuales, es antecedente que debe tomarse en cuenta. Para ello se admite la subordinación de la minoría a la mayoría, siempre que no se rocen los derechos propios de la individualidad. Ejercerlos de otra manera, es usar de la *superstición que acuerda derechos absolutos a los gobiernos, en razón del derecho divino de las mayorías. La fuente de la autoridad del Estado no es celestial, sino terrestre. La teoría utilitaria no puede justificar excesos.* Es por eso que no creemos que pueda existir ningún régimen de gobierno respetuoso del individuo si no es sustentado sobre el principio de la legalidad. La legalidad a su vez tiene un símbolo: el régimen constitucional." (Énfasis suplido.) C.A. Ayarragaray, *El Ministerio Público y la libertad*, XXXII Rev. C. Abo. Buenos Aires 209, 235–236 (1954).

Sin controles, la labor investigativa gubernamental *necesaria* es dañina. Tiene el peligroso potencial de transformarse e institucionalizarse en espionaje oficial, capaz de sofocar el respetable derecho al pensamiento honrado, aunque éste signifique una postura de radical desavenencia ideológica frente al Estado y a las mayorías. Incide en el derecho

a la disidencia, materia prima natural e insustituible que abona las raíces del árbol de la democracia.

La práctica de documentalmente lacrar como estigma el disentimiento de quienes mantienen un criterio que el Estado o una mayoría intransigente considera una "amenaza" a su seguridad atenta crudamente contra el derecho elemental a la libre expresión individual. Tiende a limitar y a condicionar el surgimiento y desarrollo de los partidos políticos. Ello inclina peligrosamente la balanza hacia el Estado y sólo favorece a aquellos partidos políticos y sus miembros que ideológicamente han propulsado afianzar el vínculo permanente con Estados Unidos. *P.I.P. v. E.L.A.*, supra.

## III

La compleja tarea reservada al foro judicial para remediar este mal, por imperativo, no es perfecta. Aspira a diseñar y poner en vigor un mecanismo procesal que subsane, aunque sea parcialmente, los perjuicios sufridos por miles de ciudadanos. Las medidas adoptadas por el ilustrado tribunal de instancia intentan poner fin a la práctica del "fichaje", a la par que hacen viable la recuperación de los expedientes por parte de los afectados para cualesquiera fines lícitos. Como remedio humano, la experiencia nos revelará sus defectos. Goza, sin embargo, de la suficiente flexibilidad para que, sobre la marcha, puedan hacerse los reajustes necesarios de modo que no se afecten otros importantes derechos ciudadanos o se ponga al Estado en la precaria situación de no poder desempeñar cabalmente sus funciones investigativas legítimas. "Las aportaciones de la labor judicial al conglomerado social se reconocen fácilmente en tiempos de crisis y cambio social en los que, al cuestionarse la vigencia de ciertas normas generales, se impone una mayor dosis de creatividad y remodelación de la materia jurídica." Díaz Suárez, *supra*, pág. 1673.

## IV

Frente a la preeminencia de los derechos violados, los señalamientos de errores procesales levantados por el Estado se abstraen de la realidad de los seres humanos de carne y hueso y del alcance de la verdadera naturaleza y magnitud de la lesión espiritual incurrida. *No es suficiente el acto de contrición en aceptación de su inconstitucionalidad.* No es posible sostener que nos enfrentamos a un simple reclamo que sólo afecta a los protagonistas litigantes, el representante David Noriega Rodríguez y el Lcdo. Graciany Miranda Marchand. En juego están los derechos constitucionales violados de un considerable sector de nuestros ciudadanos que, aunque innominados, son acreedores a nuestra mayor protección.

Por años el Estado hizo caso omiso a voces libertarias que clamaron su repudio.(5) Aun así, mantuvo un absoluto mutismo y continuó impasiblemente, de manera oculta, la práctica. Ante esa dolorosa realidad, ¿con qué fuerza legal y moral puede reclamar ahora nuestra abstención e insistir en abrogarse y recobrar la prerrogativa —que antes tuvo y no ejerció— de establecer el procedimiento conducente a la eliminación de tan funesta práctica? Tuvo como cómplices el conformismo material mayoritario y el adormecimiento de la conciencia colectiva. No podemos olvidar que "[p]ara recuperar su libertad el hombre necesita, ante todo, *recobrar una conciencia plena de la realidad.* Saber, en otros términos, que derribados los tiranos, abandonadas las ideologías, conquistado el bienestar y la seguridad material, no es un hombre libre. *Que a las tiranías visibles y concretas de antaño se han sustituido mil tiranías invisibles, a las cuales es preciso identificarlas y llamarlas a cada una por su nombre.*

---

(5) Informe de la Comisión de Derechos Civiles, 2 Der. Civ. 41–54 (1973); Informe del Comité del Gobernador para el Estudio de los Derechos Civiles en Puerto Rico, 1 Der. Civ. 85, 98 (1973).

Saber, en definitiva, que la libertad debe ser entendida a la vez como verdad, como amor y como comprensión humana". (Énfasis suplido.) G. Uscatescu, *Aventura de la Libertad*, Madrid, Centro de Estudios Constitucionales, 1966, pág. 113 y ss.

Pocas veces en la historia de este Foro nos hemos confrontado con una situación que amerite tan enérgica y resuelta adjudicación remedial. Por laudable que sea, no basta el tardío arrepentimiento y la intención rectificadora gubernamental. La memoria es corta, los dirigentes políticos cambian y la historia puede repetirse. *"Frente a la tentación permanente de las élites gobernantes de concebir la legalidad como instrumento coyuntural de dirección y rectificación de la acción política*, sólo puede alzarse la conciencia del nuevo papel histórico del juez, en cuanto defensor de estructuras jurídicas muy profundas y garantes del respeto y *vigencia a unos valores que no son producto de un pacto político o de una coyuntura social, sino que pertenecen al legado y al ideal humanista de occidente."* (Énfasis suplido.) Díaz Suárez, *supra*, pág. 1675.

—O—

Opinión de conformidad emitida por el Juez Asociado Señor Hernández Denton.

Al convenir con la opinión del Tribunal reafirmamos que nuestro ordenamiento constitucional prohíbe "discrimen alguno por motivo de raza, color, sexo, nacimiento, origen o condición social, ni ideas políticas o religiosas". Art. II, Sec. 1, Const. E.L.A., L.P.R.A., Tomo 1, ed. 1982, pág. 257. En nuestra democracia, mantener un sistema de recopilación de información sobre personas y agrupaciones totalmente desvinculadas con algún hecho delictivo acaecido o vislumbrado constituye una indebida restricción a los derechos de libre expresión, a la libertad de asociación y al derecho de intimidad.

Particularmente nociva a la vida comunitaria y democrática de nuestro país ha sido la práctica, originada durante la administración del General Winship y utilizada por todos los gobernantes hasta ahora, de confeccionar listas de personas y grupos minoritarios que promueven activamente el cambio social y político mediante acciones perfectamente legítimas y legales. Aunque "las listas" han incluido a personas y entidades de diversas ideologías políticas, ha sido el movimiento independentista quien con más fuerza ha sufrido las consecuencias de este método coercitivo.

En el 1959, el Comité del Gobernador para el Estudio de los Derechos Civiles examinó los arrestos y detenciones en masa durante la revuelta nacionalista de 1950 a base de listas de personas sospechosas recopiladas por la Policía de Puerto Rico y concluyó:

> Todas las declaraciones revelan que los fiscales usaron la lista para sus investigaciones sin prueba alguna de que ella fuera verídica. No se presentó ninguna evidencia ante nosotros que nos convenciera de que la Policía ni ninguna otra autoridad gubernamental mantuvo diligentemente esta lista sobre la base de actos de violencia o conspiración para derrocar el gobierno por la fuerza, o por lo menos, de prédica en tal sentido, ni aun de participación en las actividades del Partido Nacionalista. Las autoridades gubernamentales usaron la lista a sabiendas de que era defectuosa.
>
> Es cierto, no obstante, que dichas autoridades gubernamentales hicieron esfuerzos por corregir la lista. Después de reducirla en La Fortaleza y los municipios, quedó en menos de una cuarta parte del contenido original. Sin embargo, seguía siendo demasiado deficiente. Solamente 119 personas de las procesadas resultaron culpables en los tribunales por actos de violencia y 67 por violar la Ley 53 de 1948. Sin embargo, la lista contenía un gran número de independentistas (por lo menos 200), el liderato comunista, y otras personas ajenas a la revuelta. *Informe del Comité del Gobernador para el Estudio de los Derechos Civiles en Puerto Rico (1959-CDC-001)*, 1 Der. Civ. 1, 90–91 (1973).

Finalmente, el Comité repudió el "mantenimiento por la Policía de listas de personas a base de sus ideas políticas". Informe, *supra* pág. 97.

En el 1970, la Comisión de Derechos Civiles nuevamente examinó la recopilación de nombres de personas a base de sus ideas políticas y afirmó que esto constituía "una práctica peligrosa y a veces ilegal de investigación policial sobre la conducta y actividades de individuos y grupos. [É]stas, y cualesquiera otras formas que se utilicen para recoger información, sólo se justifican cuando guardan una relación próxima, directa o circunstancial, con una posible actividad delictiva". *La vigilancia e investigación policíaca y los derechos civiles (1970-CDC-014)*, 2 Der. Civ. 27, 54 (1973).

A pesar de estas recomendaciones, las actitudes que dieron lugar a la preparación de las listas han persistido hasta nuestros tiempos y han generado a su vez actuaciones represivas del Estado que le han costado la vida a algunos de los más fervientes seguidores de la juventud independentista. No ha sido hasta la presentación de este pleito que el Estado por primera vez acepta la inconstitucionalidad de esta práctica y establece un mecanismo para atender la situación.

Sin embargo, el remedio diseñado por la Rama Ejecutiva, al depender únicamente de la voluntad del gobernante, no garantiza la eliminación permanente de las listas. Ante un reclamo legítimo de personas afectadas por esta práctica inconstitucional, corresponde a la Rama Judicial responder utilizando el recurso extraordinario del *injunction* para impedir la continuación de esta práctica y supervisar la disposición final de la información recopilada. Solamente de esta manera evitaremos que en el futuro los promotores de esta práctica intenten restituirla.